1
2
3
4
5
6
7

8          **UNITED STATES DISTRICT COURT**

9          **CENTRAL DISTRICT OF CALIFORNIA**

10          **EASTERN DIVISION**

11

12   KRISTINE S. R.,                      )   No. ED CV 19-1540-PLA
                                          )
13                  Plaintiff,            )   **MEMORANDUM OPINION AND ORDER**
                                          )
14          v.                            )
                                          )
15   ANDREW M. SAUL, COMMISSIONER         )
     OF SOCIAL SECURITY                   )
16   ADMINISTRATION,                      )
                                          )
17                  Defendant.            )
     ─────────────────────────────────── )

18

19                                      **I.**

20                                 **PROCEEDINGS**

21          Kristine S. R.[1] ("plaintiff") filed this action on August 16, 2019, seeking review of the

22   Commissioner's denial of her applications for a period of disability and Disability Insurance

23   Benefits ("DIB") and for Supplemental Security Income ("SSI") payments.  The parties filed

24   Consents to proceed before a Magistrate Judge on September 9, 2019, and September 24, 2019.

25   Pursuant to the Court's Order, the parties filed a Joint Submission (alternatively "JS") on June 18,

26   ──────────────────

27          [1]    In the interest of protecting plaintiff's privacy, this Memorandum Opinion and Order uses

28   plaintiff's (1) first name and middle and last initials, and (2) year of birth in lieu of a complete birth
     date.  See Fed. R. Civ. P. 5.2(c)(2)(B), Local Rule 5.2-1.

2020, that addresses their positions concerning the disputed issue in the case.  The Court has taken the Joint Submission under submission without oral argument.

## II.

## BACKGROUND

Plaintiff was born in 1971.  [Administrative Record ("AR") at 25, 217, 221.]  She has no past relevant work experience.  [Id. at 25.]

On February 10, 2016, plaintiff protectively filed an application for a period of disability and DIB and for SSI payments, alleging in both that she has been unable to work since September 1, 1999.[2]  [Id. at 15; see also id. at 217-20, 221-30, 241-49.]  After her applications were denied initially and upon reconsideration, plaintiff timely filed a request for a hearing before an Administrative Law Judge ("ALJ").  [Id. at 155-57.]  A hearing was held on September 10, 2018, at which time plaintiff appeared represented by an attorney, and testified on her own behalf.  [Id. at 38-74.]  A vocational expert ("VE") also testified.  [Id. at 71-73.]  On October 9, 2018, the ALJ issued a decision concluding that plaintiff was not under a disability from September 1, 1999, the alleged onset date, through October 9, 2018, the date of the decision.  [Id. at 15-27.]  Plaintiff requested review of the ALJ's decision by the Appeals Council.  [Id. at 215-16.]  When the Appeals Council denied plaintiff's request for review on June 28, 2019 [id. at 1-5], the ALJ's decision became the final decision of the Commissioner.  See Sam v. Astrue, 550 F.3d 808, 810 (9th Cir. 2008) (per curiam) (citations omitted).  This action followed.

## III.

## STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court has authority to review the Commissioner's decision to deny benefits.  The decision will be disturbed only if it is not supported by substantial

---

[2]   At the September 10, 2018, hearing, plaintiff amended her alleged onset date to February 10, 2016, the date she filed her application.  [AR at 15, 42.]

1  evidence or if it is based upon the application of improper legal standards.  Berry v. Astrue, 622

2  F.3d 1228, 1231 (9th Cir. 2010) (citation omitted).

3  "Substantial evidence . . . is 'more than a mere scintilla[,]' . . . [which] means -- and means

4  only -- 'such relevant evidence as a reasonable mind might accept as adequate to support a

5  conclusion.'"  Biestek v. Berryhill, 139 S. Ct. 1148, 1154, 203 L. Ed. 2d 504 (2019) (citations

6  omitted); Revels v. Berryhill, 874 F.3d 648, 654 (9th Cir. 2017).  "Where evidence is susceptible

7  to more than one rational interpretation, the ALJ's decision should be upheld."  Revels, 874 F.3d

8  at 654 (internal quotation marks and citation omitted).  However, the Court "must consider the

9  entire record as a whole, weighing both the evidence that supports and the evidence that detracts

10  from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum

11  of supporting evidence."  Id. (quoting Garrison v. Colvin, 759 F.3d 995, 1009 (9th Cir. 2014)

12  (internal quotation marks omitted)).  The Court will "review only the reasons provided by the ALJ

13  in the disability determination and may not affirm the ALJ on a ground upon which he did not rely."

14  Id. (internal quotation marks and citation omitted); see also SEC v. Chenery Corp., 318 U.S. 80,

15  87, 63 S. Ct. 454, 87 L. Ed.  626 (1943) ("The grounds upon which an administrative order must

16  be judged are those upon which the record discloses that its action was based.").

17

18  **IV.**

19  **THE EVALUATION OF DISABILITY**

20  Persons are "disabled" for purposes of receiving Social Security benefits if they are unable

21  to engage in any substantial gainful activity owing to a physical or mental impairment that is

22  expected to result in death or which has lasted or is expected to last for a continuous period of at

23  least twelve months.  Garcia v. Comm'r of Soc. Sec., 768 F.3d 925, 930 (9th Cir. 2014) (quoting

24  42 U.S.C. § 423(d)(1)(A)).

25

26  **A.    THE FIVE-STEP EVALUATION PROCESS**

27  The Commissioner (or ALJ) follows a five-step sequential evaluation process in assessing

28  whether a claimant is disabled.  20 C.F.R. §§ 404.1520, 416.920; Lounsbury v. Barnhart, 468

F.3d 1111, 1114 (9th Cir. 2006) (citing Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999)). In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim is denied. Lounsburry, 468 F.3d at 1114. If the claimant is not currently engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting her ability to do basic work activities; if not, a finding of nondisability is made and the claim is denied. Id. If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R. § 404, subpart P, appendix 1; if so, disability is conclusively presumed and benefits are awarded. Id. If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient "residual functional capacity" to perform her past work; if so, the claimant is not disabled and the claim is denied. Id. The claimant has the burden of proving that she is unable to perform past relevant work. Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992). If the claimant meets this burden, a prima facie case of disability is established. Id. The Commissioner then bears the burden of establishing that the claimant is not disabled because there is other work existing in "significant numbers" in the national or regional economy the claimant can do, either (1) by the testimony of a VE, or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R. part 404, subpart P, appendix 2. Lounsburry, 468 F.3d at 1114. The determination of this issue comprises the fifth and final step in the sequential analysis. 20 C.F.R. §§ 404.1520, 416.920; Lester v. Chater, 81 F.3d 721, 828 n.5 (9th Cir. 1995); Drouin, 966 F.2d at 1257.

**B.   THE ALJ'S APPLICATION OF THE FIVE-STEP PROCESS**

At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since

February 10, 2016, the amended alleged onset date.[3]  [AR at 18.]  At step two, the ALJ concluded

that plaintiff has the severe impairments of morbid obesity; schizoaffective disorder, bipolar type;

post-traumatic stress disorder ("PTSD"); lumbar degenerative disc disease; and left knee

degenerative joint disease.  [Id.]  At step three, the ALJ determined that plaintiff does not have an

impairment or a combination of impairments that meets or medically equals any of the impairments

in the Listing.  [Id.]  The ALJ further found that plaintiff retained the residual functional capacity

("RFC")[4] to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b),[5] as follows:

> [She] can stand and/or walk for two hours in an eight hour workday with normal breaks; can never climb ladders, ropes, and scaffolds; can occasionally climb ramps and stairs; occasionally stoop, kneel, crouch, balance, never crawl; must avoid vibration; high, exposed places; and working around machinery with unguarded moving parts. In addition, [she] can understand, remember and carry out simple instructions and make simple work related decisions; can tolerate occasional interaction with co-workers, is unable to interact with the general public, and can tolerate occasional changes in a routine work setting.

[Id. at 20-21.]  At step four, based on plaintiff's RFC and the testimony of the VE, the ALJ

concluded that plaintiff has no past relevant work.  [Id. at 25, 71.]  At step five, based on plaintiff's

RFC, vocational factors, and the VE's testimony, the ALJ found that there are jobs existing in

significant numbers in the national economy that plaintiff can perform, including work as a "lens

gauger" (Dictionary of Occupational Titles ("DOT") No. 716.687-030), as a "table worker" (DOT

---

[3]    The ALJ concluded that plaintiff met the insured status requirements of the Social Security Act through September 30, 1999.  [AR at 18.]

[4]    RFC is what a claimant can still do despite existing exertional and nonexertional limitations.  See Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).  "Between steps three and four of the five-step evaluation, the ALJ must proceed to an intermediate step in which the ALJ assesses the claimant's residual functional capacity."  Massachi v. Astrue, 486 F.3d 1149, 1151 n.2 (9th Cir. 2007) (citation omitted).

[5]    "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."  20 C.F.R. §§ 404.1567(b), 416.967(b).

1   No. 739.687-182), and as a "circuit board assembler" (DOT No. 726.689-110).[6]  [AR at 26, 72.]

2   Accordingly, the ALJ determined that plaintiff was not disabled at any time from the alleged onset

3   date of September 1, 1999, through October 9, 2018, the date of the decision.  [Id. at 27.]

4

5                                              **V.**

6                                    **THE ALJ'S DECISION**

7          Plaintiff contends that the ALJ erred when he failed to properly evaluate the opinions of

8   plaintiff's treating psychiatrist, David Desai, M.D.  [JS at 4.]  As set forth below, the Court agrees

9   with plaintiff, in part, and remands for further proceedings.

10

11  **A.   LEGAL STANDARD**

12         "There are three types of medical opinions in social security cases:  those from treating

13  physicians, examining physicians, and non-examining physicians."  Valentine v. Comm'r Soc. Sec.

14  Admin., 574 F.3d 685, 692 (9th Cir. 2009); see also 20 C.F.R. §§ 404.1502, 404.1527.[7]  The Ninth

15  Circuit has recently reaffirmed that "[t]he medical opinion of a claimant's treating physician is given

16  'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory

17  diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's]

18

19  _____

20         [6]     Although not at issue herein, the Court observes that the VE testified there are 22,000 and
    24,000 positions in the national economy for the occupations of lens gauger and table worker,
21  respectively.  See Gutierrez v. Comm'r of Soc. Sec., 740 F.3d 519, 529 (9th Cir. 2014) (noting that
    under current Ninth Circuit case law, a "finding that 25,000 national jobs is sufficient presents a close
22  call").

23         [7]     The Court notes that for all claims filed on or after March 27, 2017, the Rules in 20 C.F.R.
    § 404.1520c (not § 404.1527) shall apply.  The new regulations provide that the Social Security
24  Administration "will not defer or give any specific evidentiary weight, including controlling weight,
    to any medical opinion(s) or prior administrative medical finding(s), including those from your
25  medical sources."  20 C.F.R. § 404.1520c.  Thus, the new regulations eliminate the term "treating
    source," as well as what is customarily known as the treating source or treating physician rule.
26  See 20 C.F.R. § 404.1520c; see also 81 Fed. Reg. 62560, at 62573-74 (Sept. 9, 2016).  However,
    the claim in the present case was filed before March 27, 2017, and the Court therefore analyzed
27  plaintiff's claim pursuant to the treating source rule set out herein.  See also 20 C.F.R. § 404.1527
    (the evaluation of opinion evidence for claims filed prior to March 27, 2017).
28

1  case record.'"  Trevizo v. Berryhill, 871 F.3d 664, 675 (9th Cir. 2017) (quoting 20 C.F.R. §

2  404.1527(c)(2)) (second alteration in original).  Thus, "[a]s a general rule, more weight should be

3  given to the opinion of a treating source than to the opinion of doctors who do not treat the

4  claimant."  Lester, 81 F.3d at 830; Garrison, 759 F.3d at 1012 (citing Bray v. Comm'r Soc. Sec.

5  Admin., 554 F.3d 1219, 1221, 1227 (9th Cir. 2009)); Turner v. Comm'r of Soc. Sec., 613 F.3d

6  1217, 1222 (9th Cir. 2010).  "The opinion of an examining physician is, in turn, entitled to greater

7  weight than the opinion of a nonexamining physician."  Lester, 81 F.3d at 830; Ryan v. Comm'r

8  of Soc. Sec., 528 F.3d 1194, 1198 (9th Cir. 2008).

9       "[T]he ALJ may only reject a treating or examining physician's uncontradicted medical

10  opinion based on clear and convincing reasons."  Trevizo, 871 F.3d at 675 (citing Ryan, 528 F.3d

11  at 1198).  "Where such an opinion is contradicted, however, it may be rejected for specific and

12  legitimate reasons that are supported by substantial evidence in the record."  Id. (citing Ryan, 528

13  F.3d at 1198).  When a treating physician's opinion is not controlling, the ALJ should weigh it

14  according to factors such as the nature, extent, and length of the physician-patient working

15  relationship, the frequency of examinations, whether the physician's opinion is supported by and

16  consistent with the record, and the specialization of the physician.  Trevizo, 871 F.3d at 676; see

17  20 C.F.R. § 404.1527(c)(2)-(6).  The ALJ can meet the requisite specific and legitimate standard

18  "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence,

19  stating his interpretation thereof, and making findings."  Reddick v. Chater, 157 F.3d 715, 725 (9th

20  Cir. 1998).  The ALJ "must set forth his own interpretations and explain why they, rather than the

21  [treating or examining] doctors', are correct."  Id.

22       Although the opinion of a non-examining physician "cannot by itself constitute substantial

23  evidence that justifies the rejection of the opinion of either an examining physician or a treating

24  physician," Lester, 81 F.3d at 831, state agency physicians are "highly qualified physicians,

25  psychologists, and other medical specialists who are also experts in Social Security disability

26  evaluation."  20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i); Soc. Sec. Ruling 96-6p; Bray, 554

27  F.3d at 1221, 1227 (the ALJ properly relied "in large part on the DDS physician's assessment" in

28  determining the claimant's RFC and in rejecting the treating doctor's testimony regarding the

7

1  claimant's functional limitations).   Reports of non-examining medical experts "may serve as

2  substantial evidence when they are supported by other evidence in the record and are consistent

3  with it."  Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995).

4

5  **B.   DR. DESAI'S OPINIONS**

6      Dr. Desai, plaintiff's treating psychiatrist, treated plaintiff from January 14, 2016, to April 25,

7  2018.  [AR at 344-74, 496-636, 772.]  During that period, and based on the treatment records that

8  are included in the Administrative Record, he saw plaintiff at least twenty-seven times

9  (approximately twice a month through September 2016 and once a month after that through

10  August 2017).  [Id.]  On April 25, 2018, Dr. Desai provided a "Recommendation Letter for SSI

11  Disability Income" ("Letter") in which he "verified" that he had treated plaintiff since January 14,

12  2016, for her schizoaffective disorder - depressed, PTSD, and generalized anxiety disorder.[8]  [Id.

13  at 772.]  The Letter stated that plaintiff has "severe depression/anxiety/difficulty concentration

14  [sic]/irritability/poor social interaction."  [Id.]  It further stated that because of her symptoms, plaintiff

15  has "moderate difficulty in following & comprehending instructions, inability to do complex and

16  variable tasks of different nature, sensitive to criticism, difficulty getting along with coworkers due

17

18      [8]   The letterhead on the Letter represents Dr. Desai's name in the caption heading and in the

19  signature block as "Desai David MD."  [AR at 772.]  In contrast, his treatment records indicate that
   they were electronically signed by "DESAI, DAVID," generated by "David Desai," and/or that plaintiff

20  was "checked out" by "David Desai."  [See, e.g., id. at 500.]  Additionally, Dr. Desai's practice group
   is reflected in the treatment records and one facsimile cover sheet as "Inland Psychiatric Medical

21  Group, Inc." (alternatively "IPMG"), while in the Letter it is merely stated as "Inland Psychiatric Medical

22  Group."  [Compare, e.g., id. at 349, 495, 496, with id. at 772; but see id. at 343 (facsimile cover sheet
   from the "Inland Psychiatric Medical Group" medical records department).]  Finally, the heading of

23  the Letter indicates that "Desai David MD" is a "Diplomat of American Board for Psychiatry &
   Neurology" [id. at 772], while the correct terminology is "Diplomate of American Board of Psychiatry

24  & Neurology," as reflected on Dr. Desai's biography on the IPMG website.  See, e.g.,
   http://www.inlandpsych.com/ providers/david-desai (last visited June 29, 2020).  It appears to the

25  Court, therefore, that the Letter may have been prepared by someone other than Dr. Desai and then

26  submitted to him for his signature.  On the date that the Letter was dated, and as of the date of the
   hearing (when plaintiff's counsel first submitted the Letter to the ALJ) [AR at 41], plaintiff was

27  represented by a different law firm from the one that is representing her in this appeal.  [See id. at 15.]
   In any event, it appears that Dr. Desai signed the Letter and the Court, therefore, accepts that it

28  reflects his opinions of plaintiff's mental health symptoms and functional limitations.  [Id. at 772.]

to irritably [sic], unable to carry out job responsibilities independently or with supervision."  [Id.]
Dr. Desai opined that in his "professional opinion, [plaintiff] will benefit from SSI benefit [sic] due
to her chronic mental illness which is holding her from obtain [sic] any job & I strongly recommend
it."  [Id.]

The ALJ gave "partial weight" to Dr. Desai's Letter:

> The assessment of [plaintiff's] limited to [sic] ability to interact with coworkers and
> the general public are adopted in the above residual functional capacity assessment.
> These limitations are supported by the objective medical evidence and consistent
> with evidence from other medical and nonmedical sources, as discussed in this
> decision.  However, the undersigned adopts different mild to moderate mental
> limitations because mild to moderate limitations are most consistent with [her]
> medical records as discussed in this decision.  Further, the State agency
> psychological consultants opined [plaintiff] only had mild to moderate mental
> limitations as discussed above, which are inconsistent with [Dr. Desai's] opinion.

[Id. at 24-25.]

### 1.    The Parties' Contentions

Plaintiff argues that the ALJ erred when he failed to adopt Dr. Desai's treating opinions
because (1) the ALJ failed to explain how he determined that Dr. Desai's opinions regarding
plaintiff's "poor social interaction, severe anxiety, and sensitivity to criticism, correlated with the
ALJ's varying RFC limitations with respect to coworkers, supervisors, and the general public; and
(2) the ALJ failed to provide specific and legitimate reasons supported by substantial evidence
when he discounted Dr. Desai's treating opinions and gave greater weight to the mild to moderate
social limitations found by the State agency medical consultants who reviewed the record because
their opinions were the "most consistent" with the medical records.

### a.    The ALJ's Failure to Explain the RFC Social Limitations

Plaintiff acknowledges that the ALJ adopted Dr. Desai's opinions regarding the limitations
in her ability to interact with coworkers and the general public when he assessed occasional
interaction with coworkers, and no interaction with the general public.  [JS at 6 (citing AR at 24).]
She notes, however, that Dr. Desai "did not distinguish between the three subcategories of
interacting with supervisors, coworkers, and the general public," but instead generally "found poor

1   social interaction," as well as severe anxiety and sensitivity to criticism.  [Id. (citing AR at 722).]

2   She argues that the ALJ "failed to explain how or why Dr. Desai's statements correlate with

3   limitations in interacting with coworkers and the general public, but not supervisors" -- a "glaring

4   [omission] . . . given that handling criticism is a main component of interacting with supervisors."

5   [Id. (citing Program Operations Manual System DI ("POMS") 25020.010, which lists "accept

6   instructions and respond appropriately to criticism from supervisors" as a mental ability "critical for

7   performing unskilled work").]  Plaintiff asserts, therefore, that the "ALJ's determination that adopts

8   Dr. Desai's medical findings to assess limitations in social interaction with coworkers and the

9   general public, but not with supervisors, is unsupported."  [Id. at 7.]  In the alternative, plaintiff

10   argues that even if Dr. Desai intended to limit plaintiff with respect to interacting with coworkers

11   and the general public, but not with respect to supervisors, the ALJ (who "claimed to have adopted

12   Dr. Desai's opinions regarding [plaintiff's] social interaction deficits") still failed to explain why

13   plaintiff -- who is totally precluded from interacting with the general public -- is otherwise able to

14   interact with coworkers occasionally "or up to one-third of the workday."  [Id.]

15        Defendant responds that the ALJ "reasonably accounted for the unspecified difficulty Dr.

16   Desai opined [with respect to interaction with others] by restricting Plaintiff to occasional interaction

17   with coworkers, [thus] addressing the only specific category of interaction Dr. Desai identified in

18   his opinion," and then went a step further by precluding any interaction with the public.  [Id. at 13

19   (citing AR at 21, 772).]  He states that the ALJ's RFC limitations to occasional interaction with

20   coworkers and no interaction with the public, are supported by the September 14, 2016, opinion

21   of Dr. Walls, "who found that Plaintiff could tolerate limited contact with coworkers and accept

22   supervision, but that due to anxiety around strangers, she would not be successful dealing with

23   the public."  [Id. (citing AR at 112-13, 117-18).]  Defendant notes that Dr. Walls stated that Dr.

24   Desai's mental status examination findings were "essentially normal," and that other medical

25   evidence of record from the same period reflected that plaintiff "did not mention active mental

26   symptoms at her treatments" and that "[o]bjective findings remained [in] normal range."  [Id. (citing

27   AR at 112, 465-67, 470-73, 481, 645).]  He states that based on the evidence as a whole,

28   including the medical opinion evidence and plaintiff's admitted daily activities (taking care of her

twelve-year-old child, regularly socializing with family and friends), "the ALJ reasonably determined that Plaintiff would have the most difficulty dealing with strangers and thus would be better able to interact with coworkers and supervisors than the general public." [Id. at 14.]

Plaintiff replies that Dr. Desai assessed "a global difficulty in social interaction" and that nothing in his Letter "distinguished that [plaintiff] would have no difficulty interacting with supervisors; that she could tolerate occasional interaction with coworkers; and that she is precluded from interacting with the public." [Id. at 19.] Plaintiff deems it "debatable" as to whether the opinions of Dr. Walls and Dr. Prout – the two non-examining State agency psychological consultants -- even rise to the level of substantial evidence, but asserts that even if they do, "the question here is whether the ALJ committed legal error in evaluating Dr. Desai's opinions." [Id. (citing Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996)).]

In light of the Court's decision to remand for reconsideration of the medical evidence of record generally, and Dr. Desai's Letter and treatment records specifically, as discussed below, it will not address these arguments herein.

### b.    Weight Given by the ALJ to the Reviewing Consultants

Plaintiff takes issue with the ALJ's determination to assess mild to moderate mental limitations, because he found mild to moderate limitations to be "most consistent" with the medical records and the assessment of the State agency medical consultants who reviewed the record. [Id. (citing AR at 24-25).] She argues that this is not a specific and legitimate reason based on substantial evidence for rejecting a treating doctor's opinions. [Id. at 8 (citing Lester, 81 F.3d at 830-31).] Specifically, she contends that this reason "lacks specificity as a matter of law," because saying that medical opinions are not supported by sufficient objective findings or are contrary to the conclusions mandated by the objective findings, "does not achieve the level of specificity our prior cases have required, even when the objective factors are listed seriatim." [Id. (citing Regennitter v. Comm'r of Soc. Sec. Admin., 166 F.3d 1294, 1299 (9th Cir. 1999)).] Plaintiff also observes that the ALJ's determination that the medical records reflect only a mild to moderate degree of severity in her mental limitations is in error, and cites to numerous records from Dr.

Desai reflecting either poor symptom control [id. at 8-9 (citing AR at 344, 349, 354, 359, 364, 501, 506, 512, 535, 541, 547, 554, 561, 592, 636)], or fair symptom control [id. (citing AR at 370, 496, 518, 523, 529, 568, 576, 584, 600, 609, 618, 627).]  She further argues that case authority has found that "a fair limitation is sufficiently severe enough to merit consideration," and "still signifies the presence of significant functional loss." [Id. at 9 (citing Edlund v. Massanari, 253 F.3d 1152, 1154-55 (9th Cir. 2001))[9].]  Plaintiff states that even if fair control indicates an abatement of symptoms, "periodic periods of assumed cessation of symptoms is not inconsistent with disability," and notes that at all times she was given a global assessment of function ("GAF") score of 40.[10] [Id. (citations omitted).]  Plaintiff concludes that the ALJ's claim that the medical record supports "a mild to moderate degree of functional loss is unsupported," and asserts that the ALJ erred when he failed to articulate any legitimate reason supported by substantial evidence for discounting Dr. Desai's opinions.  [Id. at 10 (citation omitted).]

Defendant responds that the ALJ reasonably gave only partial weight to Dr. Desai's opinions and greater weight to the opinions of the two State agency consultants, Maurice Prout, Ph.D., and P. Walls, M.D., "who were familiar with requirements of Social Security disability, and whose opinions were more consistent with the record as a whole." [Id. (citing AR at 19-24, and others).]  He states that, as found by the ALJ, Dr. Desai "routinely described" plaintiff's mental status examinations as "unremarkable" or "generally normal," and notes that although Dr. Desai stated in his Letter that plaintiff "has been unable to work since 1995," that was "20 years before he began treating her, due to chronic mental illness." [Id. (citing AR at 345, 349-50, 354-55, 364-65, 371, 497, 513).]  Defendant also points out that the ALJ acknowledged Dr. Desai's opinion that plaintiff's symptoms result in poor interactions with others, and asserts that the ALJ properly

---

[9]     The court in Edlund noted that the definition of "fair" reflects that the ability to function "in this area is seriously limited but not precluded," for purposes of the ALJ's step two assessment of the severity of an impairment.  Edlund, 253 F.3d at 1154 n.4, 1159.  In this case, the ALJ determined at step two that plaintiff's mental impairments were severe.

[10]     In light of the Court's determination herein, the issue of plaintiff's consistently low GAF score (which was assessed at intake to range from a low of 40 to a high of 55) [AR at 345], and which was reassessed at 50 on July 5, 2017 [id. at 629, 638], will not be discussed herein.

concluded that Dr. Desai's opinions were "overly restrictive in light of the grossly normal clinical findings on mental status examination." [Id. (citing AR at 19-20, 23-24).]  Defendant specifically asserts the following:

> In contrast to Dr. Desai's opinion that Plaintiff was unable to perform any work due to "chronic mental illness," the ALJ pointed out that the doctor's mental status examination findings were grossly normal.  Indeed, Dr. Desai's own treatment notes repeatedly described Plaintiff's mental status as "unremarkable" and "generally normal."  While Plaintiff complained of anxious/fearful thoughts and depressed mood, Dr. Desai consistently noted that she nevertheless "had normal appearance, attitude, mood and affect, speech, thought process, perception, thought content, cognition, insight, judgment and average intelligence."  This inconsistency between Dr. Desai's opinion and the doctor's own clinical findings was a valid basis for discounting his opinion.

[Id. at 12 (citing AR at 23, 24 and others).]

Defendant also contrasts Dr. Desai's findings of irritability, depression, and anxiety, resulting in poor social interactions, with Dr. Desai's mental status examinations reflecting "normal moods, insight and judgment," and "which the ALJ reasonably found indicated no more than moderate limitation in the area of social interaction." [Id. at 14-15 (citing AR at 19).]  Defendant submits that the ALJ's explanation that Dr. Desai's "mental status examinations showed Plaintiff usually had normal mood and affect, cognition, intelligence, attitude, and thought content, which indicated only mild limitation with regard to concentrating, persisting, or maintaining pace," was reasonable.  [Id. (citing AR at 19).]  Defendant contends that although the ALJ "referred back to his previous discussion [at step two] as to how Plaintiff's medical records showed only mild to moderate limitations," rather than repeating his previous detailed step two explanation, this "was sufficient to enable the Court to discern the ALJ's reasoning." [Id. (citations omitted).]  Defendant again suggests that the ALJ "reasonably accounted for the presence of any functional loss from Plaintiff's ongoing symptoms by limiting her to a reduced range of simple work" -- again because Dr. Desai said plaintiff had "poor to fair control of her symptoms, yet he also consistently described Plaintiff's mental status examinations as 'unremarkable' and 'generally normal' and observed her to have normal cognition, activity, and appearance, cooperative demeanor, clear speech, logical thought process, average intelligence, and normal insight and judgment." [Id. at 16-17 (citing AR at 19-20, 23-24).]

1    She points out that because the ALJ did not articulate plaintiff's daily activities as a basis

2    for discounting Dr. Desai's opinions, defendant's suggestion that this was a valid reason is "post-

3    hoc rationale [that] should be rejected."[11] [Id. at 19-20 (citing Orn v. Astrue, 495 .3d 625, 630 (9th

4    Cir. 2007)).]  In any event, plaintiff argues that activities at home are different from work activities,

5    and defendant "does not explain how interacting with family and friends somehow results in no

6    limitation in interacting with supervisors, occasional interaction with coworkers, and no interaction

7    with the general public."  [Id. at 20 (citations omitted).]

8

9    **2.    Analysis**

10   At step two, the ALJ rejected Dr. Desai's opinions (that plaintiff would have moderate

11   difficulty in following and comprehending instructions, doing complex and variable tasks of different

12   natures, and carrying out responsibilities independently or with supervision; was sensitive to

13   criticism; and would have difficulty getting along with coworkers), in favor of the mild to moderate

14   mental limitations found by the State agency consultants.  [AR at 19-20.]  Specifically, with respect

15   to his determination that plaintiff had only a mild limitation in understanding, remembering, or

16   applying information, the ALJ relied primarily on the fact that Dr. Desai's mental status

17   examinations generally reflected that plaintiff "demonstrated average intelligence and cognition."

18   [Id. at 19 (citing id. at 347, 349-50, 352, 355, 356, 370-71).]  Similarly, with regard to

19   concentrating, persisting, or maintaining pace, the ALJ accepted the opinion of the State agency

20   consultants that plaintiff had mild limitations, based almost exclusively on the fact that Dr. Desai's

21   mental status examinations reflect that plaintiff "had largely normal findings for mood and affect,

22   cognition, intelligence, attitude, and thought content."  [Id. (citing id. at 347, 349-50, 352, 355,

23

24   [11]   The Court agrees.  "Long-standing principles of administrative law require [this Court] to
25   review the ALJ's decision based on the reasoning and factual findings offered *by the ALJ* -- not
     post hoc rationalizations that attempt to intuit what the adjudicator may have been thinking."  Bray,
26   554 F.3d at 1225-26 (emphasis added, citation omitted); Pinto v. Massanari, 249 F.3d 840, 847
     (9th Cir. 2001) ("[W]e cannot affirm the decision of an agency on a ground that the agency did not
27   invoke in making its decision.").  The Court will not consider reasons for discounting medical
     opinion evidence that were not given by the ALJ in the decision.  See Trevizo, 871 F.3d at 677 &
28   nn.2, 4 (citation omitted).

356).]

The ALJ, however, did not explain how plaintiff's "average intelligence and cognition," and unremarkable or "largely normal" mood and affect, attitude, and thought content as reported during consultations with her psychiatrist means that plaintiff -- contrary to her psychiatrist's opinion -- is therefore no more than mildly limited in her ability to understand, remember, or apply information, and in her ability to concentrate, persist, or maintain pace.  That is, the ALJ does not explain how "average intelligence and cognition" equates to mild limitations in the "ability to understand, remember, or apply information"; or how unremarkable mood and affect, attitude, and thought, equate to mild limitations in the ability to concentrate, persist, or maintain pace.  The ALJ's conclusory statements simply do not amount to a specific and legitimate reason for discrediting Dr. Desai's opinion.  Garrison, 759 F.3d at 1012 (stating that the "ALJ must do more than state conclusions.  He must set forth his own interpretations and explain why they, rather than the doctor's, are correct").

This is especially true where, as here, the ALJ focused on only select portions of Dr. Desai's treatment notes -- the mental status examinations -- as a basis for his decision and altogether omitted or discounted consideration of the fact that additional significant information in the same records reflecting unremarkable mental status examinations (as well as in Dr. Desai's other records not mentioned by the ALJ (or by the psychological consultants)) is *not* consistent with the ALJ's determination to discount Dr. Desai's opinions.  For instance, a review of the records relied on by the ALJ to support his determination for only mild limitations [AR at 19 (citing id. Ex. 1F at 6, 8-9, 11, 14-15, and 29-30)], reflects that at the four treatment visits covered by those notes, including plaintiff's initial psychiatric evaluation in January 2016 [id. at 344-47 (Ex. 1F at 6)], while the mental status examination itself may have reflected "unremarkable" or "generally normal" findings, the corresponding treatment notes -- which were significantly more detailed -- reflected poorly or fairly controlled symptoms as follows:

- January 14, 2016 [Ex. 1F at 6]:  plaintiff's symptoms were described as constant, poorly controlled, and worsening; she described functioning to be very difficult; she presented with "anxious/fearful thoughts, depressed mood, difficulty concentrating,

15

difficulty falling asleep, difficulty staying asleep, diminished interest or pleasure, easily startled, excessive worry, fatigue, feelings of guilt, hallucinations (auditory), paranoia, restlessness and thoughts of death or suicide" [AR at 344]; Dr. Desai independently found plaintiff to be "positive" for these symptoms [id. at 345];

- January 27, 2016 [Ex. 1F at 8-9, 11]:  plaintiff's symptoms were described as constant, poorly controlled, and worsening; she described functioning to be very difficult; Dr. Desai independently found plaintiff to be "positive" at this visit for irritability; anxiety; feeling down, depressed or hopeless; hallucinations; little interest or pleasure in doing things; and paranoia [AR at 349-50], but found her negative for suicidal ideation [id. at 350];

- February 5, 2016 [Ex. 1F at 14-15]:  plaintiff's symptoms were described as constant, poorly controlled, and as a continuation of her initial symptoms [AR at 353]; Dr. Desai independently found plaintiff to be "positive" at this visit for anxiety; excessive worry; and feeling down, depressed, or hopeless; but found her negative for hallucinations and suicidal ideation [id. at 354]; and

- April 22, 2016 [Ex. 1F at 29-30]:  plaintiff's symptoms were described as occurring intermittently, "fairly" controlled, and as an improvement of initial symptoms [AR at 370]; Dr. Desai, however, also found plaintiff to be positive at this visit for anxiety and hallucinations, but negative for suicidal ideation [id. at 372.]

Clearly, plaintiff's "average intelligence and cognition," and her unremarkable mood and affect, attitude, and thought at various treatment visits, was considered by the ALJ in isolation, and not with respect to Dr. Desai's treatment record as a whole.

In fact, an ALJ must consider all of the relevant evidence in the record and may not point to only those portions that bolster his findings.  See, e.g., Holohan v. Massanari, 246 F.3d 246 F.3d 1195, 1207-08 (9th Cir. 2001) (holding that an ALJ cannot selectively rely on some entries in plaintiff's records while ignoring others).  As the Ninth Circuit recently explained, with respect to mental health issues, "symptoms wax and wane in the course of treatment."  Garrison, 759 F.3d at 1017; see also Attmore v. Colvin, 827 F.3d 872, 878 (9th Cir. 2016) ("It is the nature of bipolar

1    disorder that symptoms wax and wane over time").  "Cycles of improvement and debilitating

2    symptoms are a common occurrence, and in such circumstances it is error for an ALJ to pick out

3    a few isolated instances of improvement over a period of months or years and to treat them as a

4    basis for concluding a claimant is capable of working." Garrison, 750 F.3d at 1017 (citing Holohan,

5    246 F.3d at 1205); see also Scott v. Astrue, 647 F.3d 734, 739-40 (7th Cir. 2011) (citations

6    omitted) ("There can be a great distance between a patient who responds to treatment and one

7    who is able to enter the workforce, and that difference is borne out in [the] treatment notes.  Those

8    notes show that although [plaintiff] had improved with treatment, she nevertheless continued to

9    frequently experience bouts of crying and feelings of paranoia.  The ALJ was not permitted to

10   'cherry-pick' from those mixed results to support a denial of benefits.").  Individuals with a mental

11   health issue "experience fluctuations in their symptoms, so any single notation that a patient is

12   feeling better or has had a 'good day' does not imply that the condition has been treated." Scott,

13   647 F.3d at 740 (citation omitted) (in the context of a bipolar disorder).

14        Thus, "[r]eports of 'improvement' in the context of mental health issues must be interpreted

15   with an understanding of the patient's overall well-being and the nature of her symptoms."

16   Garrison, 759 F.3d at 1017 (citing Ryan, 528 F.3d at 1200-01); see also Holohan, 246 F.3d at

17   1205 ("[The treating physician's] statements must be read in context of the overall diagnostic

18   picture he draws.  That a person who suffers from severe panic attacks, anxiety, and depression

19   makes some improvement does not mean that the person's impairments no longer seriously affect

20   her ability to function in a workplace.").

21        Here, the same treatment notes that contain mental status examination findings describing

22   plaintiff as having "average intelligence and cognition," and "unremarkable" or "normal" mood and

23   affect, attitude, and thought content (among other things) during appointments with her

24   psychiatrist, also indicate that at the four visits relied on by the ALJ between January and April

25   2016 -- and, indeed, at all of her visits to Dr. Desai from January 2016 through late 2017 -- plaintiff

26   consistently presented to Dr. Desai with fairly or poorly controlled symptoms, including, among

27   other things, anxiety, depressed or anxious mood, fearful thoughts, diminished interest, and with

28   reports of hallucinations and/or suicidal ideation.  [See also AR at 498 (positive for weight gain;

1    feeling down, depressed or hopeless; hallucinations; paranoia); 503 (positive for difficulty initiating

2    and maintaining sleep); 506 (positive for fatigue; difficulty initiating and maintaining sleep; anxiety;

3    feeling down, depressed or hopeless; suicidal ideation; mental status examination reflected

4    anxious mood); 512 (positive for difficulty initiating and maintaining sleep; anxiety; feeling down,

5    depressed or hopeless; hallucinations); 518 (positive for feeling down, depressed or hopeless);

6    525 (positive for fatigue; anxiety; feeling down, depressed or hopeless; little interest or pleasure

7    in doing things); 531 (positive for fatigue); 537 (positive for fatigue; difficulty maintaining sleep);

8    543 (positive for weight gain; anxiety); 549 (positive for anxiety); 556 (positive for anxiety;

9    excessive worry).]   These reports of plaintiff's ongoing symptoms continue throughout the

10   remainder of Dr. Desai's treatment record and, even on the last visit in the record before the ALJ

11   and this Court, on August 2, 2017, plaintiff was positive for fatigue; feeling down, depressed, or

12   hopeless; with feelings of guilt; and with little interest or pleasure in doing things.  [Id. at 638; see

13   also id. at 557-643.]

14         While a conflict between treatment notes and a provider's opinion remains a legally sound

15   reason to discount that opinion, in this case it was improper for the ALJ to rely on "normal" or

16   "unremarkable" mental status examination findings when the treatment notes as a whole showed

17   persistent symptoms -- fluctuating between poorly and fairly controlled -- related to plaintiff's

18   severe impairments of schizoaffective disorder-bipolar type, and PTSD.  Garrison, 759 F.3d at

19   1017 (reasoning that the ALJ cannot rely on isolated evidence of improvement when the record

20   as a whole shows continuing cycles of debilitating and less severe symptoms); Attmore, 827 F.3d

21   at 875 ("We cannot affirm . . . by isolating a specific quantum of supporting evidence, but must

22   consider the record as a whole.").   Instead, the ALJ must analyze seemingly inconsistent

23   references in the treatment notes "in the context of the overall diagnostic picture" that the provider

24   has drawn.  Holohan, 246 F.3d at 1205.  In this case, that holistic analysis did not take place.

25         The ALJ here made passing reference to the fact that plaintiff's "bipolar symptoms were not

26   well controlled at some points in 2016." [AR at 23 (emphasis added).]  He then cited to the

27   following records:

28         •      February 24, 2016, mental status examination reflecting that plaintiff's mood was

depressed with constricted affect [id. at 359-60];

- • March 3, 2016, treatment note reflecting that plaintiff presented with anxious/fearful thoughts and her mental status examination reflected had a depressed mood, diminished interest or pleasure, auditory hallucinations, and paranoia [id. at 364-65];

- • September 27, 2016, treatment note reflecting that plaintiff presented with anxious/fearful thoughts, depressed mood, excessive worry, and thoughts of death or suicide (the ALJ neglected to mention, however, that plaintiff had deliberately "cut" herself the prior day) [id. at 561-62; see also id. at 763 (emergency department record noting that plaintiff had made approximately 10 superficial cuts on her left wrist with a razor due to anxiety about a dentist appointment the following day).]

The ALJ also stated, however (based, apparently, on Dr. Desai's April 22, 2016, finding that plaintiff's symptoms at that point were "fairly controlled"), that "[b]y April 2016, [plaintiff] was able to control her symptoms *fairly*." [Id. at 23 (emphasis added) (citing id. at 370).]  That, however, does not mean that at the previous visit, the next visit, or at all future visits between April 2016 and August 2017, plaintiff's symptoms were "fairly controlled" -- as discussed above, this simply was not the case.[12]  Yet, the ALJ concluded, based on these few examples, as well as on his previously discussed "normal" or "unremarkable" mental status evaluations, that "the objective mental health medical evidence regarding plaintiff's schizoaffective disorder, bipolar type, and [PTSD] disorder supports the above mental residual functional capacity assessment." [Id. at 23-24.]

        The Court finds that the ALJ discounted Dr. Desai's findings regarding plaintiff's continuing

---

        [12]   Indeed, at the prior visit on March 23, 2016, the mental status examination reflected a depressed mood, constricted affect, auditory hallucinations, and paranoid thoughts (in addition to average intelligence and normal cognition and insight), and Dr. Desai found plaintiff positive for fatigue; anxiety; feeling down, depressed or hopeless; hallucinations; little interest or pleasure in doing things; and paranoia [AR at 364-65]; at the subsequent visit on April 28, 2016, he determined (as he had on April 22, 2016), that the symptoms were fairly controlled but continuing; and plaintiff was positive for weight gain; feeling down, depressed, or hopeless; hallucinations; and paranoia.  [Id. at 496.]  By the next visit, however, on May 6, 2016, Dr. Desai found that plaintiff's symptoms were poorly controlled and occurring constantly, and that plaintiff was positive for difficulty initiating and maintaining sleep.  [Id. at 501.]

1   and fluctuating poorly or fairly controlled symptoms without any sort of specific and legitimate

2   explanation supported by substantial evidence, but based instead on the existence of "normal" or

3   "unremarkable" mental status evaluation findings that had little relation to plaintiff's symptoms or

4   limitations.  The ALJ failed to conduct a holistic analysis to consider *all* of Dr. Desai's treatment

5   records reflecting plaintiff's symptoms and, as a result, erred in finding -- without substantial

6   evidence -- that plaintiff's "normal" or "unremarkable" mental status examination findings were

7   indicative of only mild mental limitations.  The ALJ simply did not consider Dr. Desai's April 2018

8   Letter in the context of the overall diagnostic picture.

9        Additionally, with respect to the fact that the ALJ gave more weight to the non-examining

10  opinions of Dr. Prout and Dr. Walls than to Dr. Desai, who had a long-term treating relationship

11  with plaintiff, the Court notes that Dr. Prout and Dr. Walls only reviewed *three* of Dr. Desai's

12  treatment records -- those dated January 14, 2016, February 24, 2016, and April 22, 2016.  [Id.

13  at 97-98 (Dr. Prout -- who determined based on these three records that plaintiff's mental

14  impairment was non-severe), 112-13 (Dr. Walls).]  In fact, Dr. Walls on reconsideration not only

15  reviewed only these three mental health treatment notes, but he also noted that although plaintiff

16  alleged worsening of her mental health condition at reconsideration, the additional medical records

17  he had obtained and reviewed from Pinnacle Medical Group (where plaintiff obtained care related

18  to her *physical* impairments), did not mention "active mental symptoms" or an "increase in

19  paranoia" as was alleged by plaintiff.  [Id. at 112-13.]  Dr. Walls did not obtain and review any

20  additional records from Dr. Desai from April 2016 through the time of his review in September

21  2016.  Nevertheless, the ALJ gave great weight to the opinions of these psychological consultants

22  "because the opinions are based on a review of the case record that includes medical reports

23  about [plaintiff's] particular impairments," because they "have an understanding of Social Security

24  disability program policies and their evidentiary requirements," and because their opinions are

25  supported "by the objective medical evidence or other medical evidence," which reflected only "a

26  few instances of more concerning mental symptoms that were transitory, as discussed in this

27  decision." [Id. at 24.]  The fact is, these psychological consultants reviewed only three of the six

28  mental health treatment notes that were generated in the first four months of plaintiff's treatment

by Dr. Desai, and were never provided with later notes, some of which reflected "more concerning mental symptoms," transitory or otherwise continuing.

Neither did the ALJ weigh Dr. Desai's opinion with respect to the nature, extent, and length of the physician-patient working relationship, the frequency of examinations, whether his opinion is supported by and consistent with the record, and his area of specialization.  Trevizo, 871 F.3d at 676; see 20 C.F.R. § 404.1527(c)(2)-(6).  Dr. Desai had treated plaintiff for almost two years at the time of the hearing (and more than two years at the time he wrote his Letter), had seen her approximately twenty-seven times (at first bi-monthly) and later monthly from January 2016 through August 2017, and is a licensed psychiatrist.  In contrast, Dr. Prout is a psychologist who reviewed only three of Dr. Desai's twenty-seven treatment records before determining that plaintiff did not have a mental medically determinable impairment [AR at 83, 84], and Dr. Walls is apparently an M.D. (with no indicated specialization), who also reviewed only three of the twenty-seven treatment records, and who -- like the ALJ -- relied on Dr. Desai's finding on April 22, 2016, that plaintiff's symptoms "were said to be fairly controlled," as well as on unrelated physical health records, to discount plaintiff's allegations of disabling mental health symptoms and limitations.

The Court finds that the reports of these non-examining psychological consultants do not serve as substantial evidence as they are not supported by the overall evidence of record or consistent with it.  Andrews, 53 F.3d at 1041.  Therefore, the ALJ did not provide specific and legitimate reasons, supported by substantial evidence, for discounting Dr. Desai's treating opinions in favor of the opinions of the non-examining psychological consultants, and erred when he failed to weigh Dr. Desai's opinion according to the requisite factors when he determined that Dr. Desai's treating opinion was not controlling.  Trevizo, 871 F.3d at 676.

Remand is warranted on this issue.


**VI.**

**REMAND FOR FURTHER PROCEEDINGS**

The Court has discretion to remand or reverse and award benefits.  Trevizo, 871 F.3d at 682 (citation omitted).  Where no useful purpose would be served by further proceedings, or where

1   the record has been fully developed, it is appropriate to exercise this discretion to direct an

2   immediate award of benefits.  Id. (citing Garrison, 759 F.3d at 1019).  Where there are outstanding

3   issues that must be resolved before a determination can be made, and it is not clear from the

4   record that the ALJ would be required to find plaintiff disabled if all the evidence were properly

5   evaluated, remand is appropriate.  See Garrison, 759 F.3d at 1021.

6        In this case, there is an outstanding issue that must be resolved before a final determination

7   can be made.  In an effort to expedite these proceedings and to avoid any confusion or

8   misunderstanding as to what the Court intends, the Court will set forth the scope of the remand

9   proceedings.  First, because the ALJ failed to provide specific and legitimate reasons for

10  discounting the opinion of Dr. Desai, the ALJ on remand shall reassess the medical opinions of

11  record, including the opinions of Dr. Desai.  The ALJ must explain the weight afforded to each

12  opinion and provide legally adequate reasons for any portion of an opinion that the ALJ discounts

13  or rejects.  Second, the ALJ, on remand, in accordance with SSR 16-3p, shall reassess plaintiff's

14  subjective allegations and either credit her testimony as true, or provide specific, clear and

15  convincing reasons, supported by substantial evidence in the case record, for discounting or

16  rejecting any testimony.  Third, based on his reevaluation of the entire medical record, and

17  plaintiff's subjective symptom testimony, the ALJ shall determine plaintiff's RFC.  Finally, the ALJ

18  shall proceed to step five to determine, with the assistance of a VE if necessary, whether plaintiff

19  can perform any other work existing in significant numbers in the regional and national

20  economies.[13]  See Shaibi v. Berryhill, 883 F.3d 1102, 1110 (9th Cir. 2017).

21  /

22  /

23

24

---

25       [13]    Nothing herein is intended to disrupt the ALJ's findings regarding the following issues:  (1) that
26  plaintiff has at least the severe impairments of morbid obesity; schizoaffective disorder, bipolar
    type; post-traumatic stress disorder ("PTSD"); lumbar degenerative disc disease; and left knee
27  degenerative joint disease; (2) that she is capable of no more than a range of light work with at
    least the RFC limitations found in the instant decision; or (3) his step four finding that plaintiff has
28  no past relevant work.

**VII.**

**<u>CONCLUSION</u>**

**IT IS HEREBY ORDERED** that: (1) plaintiff's request for remand is **granted**; (2) the decision of the Commissioner is **reversed**; and (3) this action is **remanded** to defendant for further proceedings consistent with this Memorandum Opinion.

**IT IS FURTHER ORDERED** that the Clerk of the Court serve copies of this Order and the Judgment herein on all parties or their counsel.

**This Memorandum Opinion and Order is not intended for publication, nor is it intended to be included in or submitted to any online service such as Westlaw or Lexis.**

DATED:  June 30, 2020

_____
PAUL L. ABRAMS
UNITED STATES MAGISTRATE JUDGE